906 A.2d 1054

**STATE of Maryland**

v.

**Jonathan SAVAGE.**

**No. 0231, Sept. Term, 2006.**

Court of Special Appeals of Maryland.

Sept. 8, 2006.

150

152

Shannon Avery (J. Joseph Curran, Jr., Atty. Gen., on brief), for appellant.

Kenneth W. Ravenell, Baltimore, for appellee.

Panel MURPHY, C.J., CHARLES E. MOYLAN, JR. (retired, specially assigned), THEODORE G. BLOOM (retired, specially assigned), JJ.

MOYLAN, J.

The appellee, Jonathan Savage, was indicted by the Grand Jury for Baltimore City on ten separate counts involving Controlled Dangerous Substances. He filed a pretrial motion in the Circuit Court for Baltimore City, seeking to have the physical evidence suppressed on the ground that the police, albeit with an impeccable search and seizure warrant, entered the premises to be searched without knocking on the door, in ostensible violation of the Fourth Amendment of the United States Constitution. The motion to exclude the evidence on that ground was granted.

### A State Appeal

The State has appealed, pursuant to Maryland Code, Courts and Judicial Proceedings Article, § 12–302(c), which provides in pertinent part:

(c) *Criminal case.*—In a criminal case, the State may appeal as provided in this subsection.

. . . .

(3)(i) In ... cases under §§ 5–602 through 5–609 and §§ 5–612 though 5–614 of the Criminal Law Article, *the State may appeal from a decision of a trial court that excludes evidence offered by the State* or requires the return of property *alleged to have been seized in violation of the Constitution of the United States,* the Constitution of Maryland, or the Maryland Declaration of Rights.

. . . .

(iii) Before taking the appeal, the State shall certify to the court that the appeal is not taken for purposes of delay

and that the evidence excluded or the property required to be returned is substantial proof of a material fact in the proceeding. *The appeal shall be heard and the decision rendered within 120 days of the time that the record on appeal is filed in the appellate court. Otherwise, the decision of the trial court shall be final.*

(iv) If the State appeals on the basis of this paragraph, and if on final appeal the decision of the trial court is affirmed, the charges against the defendant shall be dismissed in the case from which the appeal was taken.

(Emphasis supplied). Accordingly, our decision in this case, should we opt to reverse, must be filed no later than September 14, 2006.

### Standard of Review

In terms of the standard of appellate review of an exclusionary ruling, any boiler-plate recitation about 1) deferring to the fact-finding of the trial judge and 2) taking that version of the facts most favorable to the prevailing party is utterly pointless in this case. We shall not be reviewing any fact-finding.

We shall review only the hearing judge's ultimate conclusory ruling that the absence of a knock amounted, *ipso facto*, to an unreasonable and, therefore, unconstitutional entry of the place to be searched. Our review in such a case consists of making, *de novo*, our own independent constitutional appraisal. *State v. Carroll*, 383 Md. 438, 445–46, 859 A.2d 1138 (2004); *Dashiell v. State*, 374 Md. 85, 93–94, 821 A.2d 372 (2003); *Rowe v. State*, 363 Md. 424, 432, 769 A.2d 879 (2001); *Cartnail v. State*, 359 Md. 272, 282, 753 A.2d 519 (2000); *Riddick v. State*, 319 Md. 180, 183, 571 A.2d 1239 (1990); *Wynn v. State*, 117 Md.App. 133, 165, 699 A.2d 512 (1997), *reversed on other grounds*, 351 Md. 307, 718 A.2d 588 (1998); *Perkins v. State*, 83 Md.App. 341, 346, 574 A.2d 356 (1990).

### Philosophical Teasers That Appear to Be Moot

This case had promise of leading us to a hidden treasure trove of intriguing nuances about the phenomenon (or phenomena) of knocking and announcing, had not that inquiry

been unceremoniously short-circuited by *Hudson v. Michigan,* 547 U.S. ——, 126 S.Ct. 2159, 165 L.Ed.2d 56 (2006).

A vintage conundrum has always been that of whether there is any sound when a great tree falls in a forest but no animal ear is within range of the percussive impact. The answer depends, of course, upon one's conceptualization of sound. The same spirit of intellectual inquiry leads us to wonder whether it makes any difference if a policeman enters a home without knocking if there is no one within to hear a knock in any event. That answer will depend upon the purpose of the knock. Is it to give notice to an occupant of an impending police entry or is it only a mechanical drill movement in a required manual of arms?

Another intriguing question, also rudely aborted by *Hudson v. Michigan,* is that of how to knock (or should one knock) on an open door. And how does one knock if there is no door at all? [1] How does one knock on the flap of a tent? Should one knock on a classical Japanese paper house if the result would be a fist through the wall? Should the police carry a knocking board with them as standard equipment? Will we ever be reduced to measuring a knock's decibel level or to evaluating its acoustical carrying power? Was it for this that the embattled farmers stood at Concord Bridge? We were well on the way to drowning in contentious urging such silliness and triviality when *Hudson v. Michigan* administered a merciful *coup de grace.*

■ Intertwined with these questions, of course, is the tantalizing semantic teaser of whether "knock and announce" is a single indivisible phenomenon or a double-barreled requirement in the unforgiving conjunctive. If the announcement of police presence is loud and clear, is a subsequent (or

---

1. See *United States v. Mendoza,* 281 F.3d 712, 717 (8th Cir.2002):

 Although this Court has not squarely addressed the issue of whether knocking is required when the door is open, or in this case, where there is no door, *most circuit courts deciding the issue have concluded when the door is open, the rule is vitiated.*

 (Emphasis supplied).

an antecedent) knock a relentlessly additional Fourth Amendment prerequisite, or is it merely an exclamation point? If the giving of notice is the animating purpose, does not the announcement alone do the trick? Is a police entry after a proclamation, with a bullhorn, "Put your hands in the air; we're coming in," unreasonable without an attendant knock? [2] In short, is not the pairing of the words "knock and announce" nothing more than a linguistic convention akin to "goods and chattels" or "give and bequeath"?

## A Quiet and Uneventful Entry

Based on overwhelming probable cause that the house at 4754 Melbourne Avenue in the Yale Heights area of Baltimore City was being used as a distribution center for contraband heroin, the police obtained a judicially issued search and seizure warrant for that address. At approximately 4:25 p.m. on June 22, 2004, a team of ten officers proceeded to that location to execute the warrant.

When the police arrived, the only person present at the house was the appellee's ultimate co-defendant, Walter Hooks. Hooks was standing on the front steps and the front door was open.[3] The police announced to Hooks that they had a warrant to search the house. Hooks was detained, and the police entered the house through the open front door. Before

---

**2.** See *United States v. Mendoza,* 281 F.3d at 717:

In making the determination of whether the Fourth Amendment has been violated by a failure to knock and announce, we must remember reasonableness is our polestar. *Underlying the knock and announce requirement is notice, and here, the officers announced their presence and were conspicuously dressed in police riot gear.* Further, the inhabitants who were outside were shouting "Police!" Given the twin auditory function of announcing ("Police! Warrant!") and knocking ("Bang-bang-bang") *it belies common sense to think officers should be forced to comply with formalistic rules when the circumstances direct otherwise.*
(Emphasis supplied).

**3.** See *United States v. Remigio,* 767 F.2d 730, 733 (10th Cir.1985):

We hold that government officials, armed with a warrant, entering a house through an open door and in the presence of a defendant, need not comply with the provisions of 18 U.S.C. § 3109.

entering, the police announced, "Police. Search Warrant." They did not, however, knock on the door. There was, it turned out, no one inside the house.

In terms of giving advance notice to an empty house, appellee's counsel, at the suppression hearing, was adamant that the prescribed drill be followed to the letter whether there is any audience for it or not.

> There was nothing that has been articulated from the witness stand that is in evidence for the Court to conclude that there was some *basis to believe that there was no one inside. But it doesn't matter. He did not knock.*

(Emphasis supplied).

The caselaw, however, focuses not on the drillbook mechanics of giving notice but on the resulting benefit of actually receiving notice. One of the cases cited by *Wilson v. Arkansas,* 514 U.S. 927, 935, 115 S.Ct. 1914, 131 L.Ed.2d 976 (1995), was the English decision in *Pugh v. Griffith,* 7 Ad & E 827, 112 Eng. Rep. 681, 686 (King's Bench 1838), which held:

> [T]he necessity of a demand ... is obviated, because there was nobody on whom a demand could be made.

In *Goodman v. State,* 178 Md. 1, 8, 11 A.2d 635 (1940), the Court of Appeals similarly observed:

> *A demand is necessary* prior to the breaking in of the doors *only where some person is found in charge of the building* to be searched.

(Emphasis supplied).

*Frankel v. State,* 178 Md. 553, 561, 16 A.2d 93, (1940), similarly stated:

> An officer ... may break open the doors if denied admittance, but *a demand is necessary* prior to breaking doors *where the premises are in charge of some one.*

(Emphasis supplied).

Approximately ten to fifteen minutes after the house had been secured, Hooks's mother arrived home at her two-story rowhouse, accompanied by Hooks's sister. The mother told the police that she lived there with her daughter. She added

that she was trying to get rid of Hooks because he "kept getting in trouble." Hooks himself, moreover, as he took the stand at the suppression hearing, gave his address as 2313 West Mosher Street.

Hooks gave a written statement to the police, admitting that the drugs found in the house were in his possession. He further testified at the suppression hearing, acknowledging that the police, before entering the house, displayed their badges to him, announced that they had a search warrant for the house, and then handcuffed him before entering the house. His cross-examination explored the circumstances of the police entry.

Q. . So it would be fair to say, Mr. Hooks that when seven or eight Police cars rolled up and you saw Police Officers there, and *they announced that they were doing a Search and Seizure Warrant on your house,* that *you knew they were doing a Search and Seizure Warrant on your house. Is that a fair statement?*

A. *Yes, ma'am.*

Q. And it would be fair to say as well that the door was partially open?

A. Partially cracked.

Q. Partially cracked, partially opened. Would it also be fair to say that *the Officers did not use a battering ram or any kind of device to open that door? Is that correct.*

A. *That's correct.*

Q. Would it be fair to say that the Officers were fairly loud in announcing that they were the Police?

A. That's incorrect.

Q. They weren't loud in announcing that they were the Police?

A. No, ma'am, just the one Officer exited the vehicle, as I said and pointed a gun at me, put the shield and made that acknowledgment and that was all.

Q. *But you knew they were Police and you knew they were executing a Search Warrant at your house?* Sir?

A. *Yes, ma'am.*

(Emphasis supplied).

### Knocking For the Sake of Knocking

No matter how placid the surface may appear, there is always someone to roil the waters. The appellee, who was not present at 4754 Melbourne Avenue at the time of the search, moved to suppress the drugs found in the house because the police, albeit fully announcing both their presence and their purpose to the only person present on the premises, failed to follow up that announcement with the formality of a ritualistic knock. However otherwise permissible the entry may have seemed, the appellee argues, the policeman forgot to say, "Mother, may I?" or did not wait for a "Simon says," and all of the physical evidence, therefore, is out of the game. In the phrase "knock and announce," so runs the appellee's argument, the emphasis is on the **AND.**

The insistent theme urged by the appellee, at the suppression hearing and at oral argument before us, was the dual requirement that the police must **BOTH** announce **AND** knock. Appellee's counsel acknowledged that there had been an adequate announcement of the police presence and purpose but demanded the exclamation point of a knock as well.

Here the dispute is not about whether thee was an announcement, but *whether there was* in fact *a knock as required by law.*

(Emphasis supplied).

Counsel represented to the hearing judge that "*Sabbath* [*v. United States* ] points out that you need both." The reference is to the pre-*Wilson v. Arkansas* case of *Sabbath v. United States,* 391 U.S. 585, 88 S.Ct. 1755, 20 L.Ed.2d 828 (1968). We have been over the *Sabbath* case with a line-by-line examination, and it says no such thing. It nowhere refers to knocking as a requirement at all, let alone as an independent requirement. Indeed, our examination of the *Sabbath* opinion with a word-by-word microscope reveals that the word "both" does not appear anywhere in the opinion. The very doctrine being

examined is not referred to as a "knock and announce" doctrine, moreover, but only as "the rule of announcement." 391 U.S. at 591, 88 S.Ct. 1755. The case was decided under 18 U.S.C., § 3109, which provides in pertinent part:

> The officer may break open any outer or inner door ... of a house ... if, *after notice of his authority and purpose,* he is refused admittance.

(Emphasis supplied).

At the outset, the *Sabbath* opinion clearly stated the issue before the Court:

> *The issue in this case is whether petitioner's arrest was invalid because* federal *officers* opened the closed but unlocked door of petitioner's apartment and *entered* in order to arrest him *without first announcing their identity and purpose.*

391 U.S. at 586, 88 S.Ct. 1755 (emphasis supplied). There is no way that anyone could conceivably extract from that opinion counsel's unequivocal statement, "*Sabbath* points out that you need both."

But for the fact this argument prevailed, we would dismiss it as meritless on its face. At the suppression hearing in this case, held three and one-half months before *Hudson v. Michigan* dramatically altered the landscape, the indispensability of the knock itself, notwithstanding an open door and notwithstanding a face-to-face announcement of self-evident police presence, was deemed to be of dispositive and fatal significance.

Defense counsel concluded his argument:

> *You must have both.* If you accept that there was an announcement, *and I don't think that Mr. Kakis's Client disputes that, that there was an announcement,* that they were there to execute a Warrant. [*Sabbath* ] tells us, *Davis* tells us,[4] 3901 tells us [5] that *there must be both.* And *here*

---

4. We have also been through *Davis v. State,* 383 Md. 394, 859 A.2d 1112 (2004), with a fine-toothed comb, and it no more tells us that "there must be both" than *Sabbath* did.

5. Section 3901 prescribes only "notice of [police] authority and purpose." It self-evidently does not say that "there must be both" an-

*there was not both. The Police had,* at best, *an announcement and no knocking* as required by the law, whether the door is partially open or not, whether the door is cracked or not. *They must knock and announce. They didn't do both.*

(Emphasis supplied).

The State responded:

Your Honor, *the purpose of knock and announce is to alert people. People were alerted. The Defendant was outside. He was made aware that the Police were there.* . . . In this particular instance, the Officers assessed the situation and opened the door that was partially opened when they arrived.

(Emphasis supplied).

The absence of the knock, however, was deemed to be constitutionally lethal.

THE COURT: *What evidence have I heard that would justify not knocking?*

[PROSECUTOR]: I think you can infer from the circumstances, Your Honor, that the Officers believed they could enter at that point, because Mr. Hooks was outside.

THE COURT: *What does that have to do with not knocking?*

[PROSECUTOR]: Well, Your Honor, the door was open. They entered through a partially open door. Whether it's open this much or open this much. You're still entering through-

THE COURT: *Don't the cases say that you cannot go through a partially open door without knocking?*

[PROSECUTOR]: They may, but under the circumstances here, Your Honor, with someone outside who could

---

nouncing and knocking. A reference to "knocking" no where appears in that statute. The appellee, in short, cites no valid authority for his assertion that "there must be both," the assertion on which the suppression in this case was necessarily predicated.

alert individuals inside. The Officers made a split second decision.

THE COURT: *What exception to the knock and announce rule is that?*

[PROSECUTOR]: None that I'm aware of.

. . . .

THE COURT: *The Motion to Suppress the evidence seized in the house in question is granted.*

(Emphasis supplied).

### Knocking is But a Modality of Announcing; It Is Not An Independent Requirement

That motion to exclude evidence was necessarily based on an alleged violation of the Fourth Amendment. The fountainhead of Fourth Amendment law with respect to the "knock and announce" requirement is *Wilson v. Arkansas*, 514 U.S. 927, 115 S.Ct. 1914, 131 L.Ed.2d 976 (1995). That case held, for the first time, that the "common-law knock-and-announce principle forms a part of the reasonableness inquiry under the Fourth Amendment." 514 U.S. at 929, 115 S.Ct. 1914.[6]

This case's semantic problem is that, although the act of knocking has never had any independent significance in the caselaw, the word "knock" nonetheless enjoys disproportionate resonance as part of a facile and easily applied label. The common law doctrine that *Wilson v. Arkansas* constitutionalized is conveniently identified as the "knock and announce" doctrine. The exception to the "knock and announce" requirement is pithily encapsulated by the phrase "no-knock," either in the form of a "no-knock" warrant or a warrantless "no-

---

**6.** As this Court observed in *State v. Riley*, 147 Md.App. 113, 115, 807 A.2d 797 (2002):

> Although the constitutional status of no-knock law necessarily depends on the fact that it was a recognized, albeit low-key, part of Anglo–American common law at the time of the framing and ratification of the Fourth Amendment (1789–1791), its significance only dawned upon us with Justice Thomas's opinion for a unanimous Supreme Court in *Wilson v. Arkansas*.

knock" entry.[7] Both the words "knock" and "no-knock" fall trippingly from the tongue—and from judicial opinions as well. When the cases get beyond the label and down to actual substance, however, reference to actual knocking virtually disappears.

## A. Supreme Court Cases Dealing With the Fourth Amendment

Although the Supreme Court, like everyone else, regularly relies on these convenient labels, the actuality of knocking itself is of no meaningful consequence. In *Wilson v. Arkansas* there was no announcement of police presence of any sort, and it is the announcement of police presence at a doorway that has the significance. The announcement could take many forms and knocking might be one of them. *Wilson v. Arkansas* began its analysis:

> [T]he reasonableness of a search of a dwelling *may depend in part on whether law enforcement officers announced their presence* and authority prior to entering.

514 U.S. at 931, 115 S.Ct. 1914 (emphasis supplied).

Justice Thomas's opinion, 514 U.S. at 931–32, 115 S.Ct. 1914, distilled the common law doctrine first and foremost from *Semayne's Case*, 5 Co Rep 91a, 77 Eng. Rep. 194, 195–96 (King's Bench 1603), as it quoted with approval:

> "But *before [the sheriff] breaks* it, *he ought to signify the cause of his coming, and to make request to open doors . . .*, for *the law* without a default in the owner *abhors the destruction or breaking of any house* (which is for the habitation and safety of man) *by which great damage* and inconvenience *might ensue to the party,* when no default is in him; *for perhaps he did not know of the process, of*

---

7. The labels "no knock" warrant and exigent "no knock" entry are obviously broader than the physical act of knocking. What may be dispensed with is not only a knocking but the announcement of police presence generally. "No knock" is obviously a convenient label for the much broader exemption of not having to give advance notice in any fashion.

*which, if he had notice, it is to be presumed that he would obey it . . . ."*

(Emphasis supplied).

*Wilson v. Arkansas,* 514 U.S. at 932, 115 S.Ct. 1914, also relied upon *Case of Richard Curtis,* Fost 135, 137, 168 Eng. Rep. 67, 68 (Crown 1757), as that case held:

*"[N]o precise form of words is required* in a case of this kind. *It is sufficient that the party hath notice,* that the officer cometh not as a mere trespasser, but claiming to act under a proper authority . . ."

(Emphasis supplied).

The Supreme Court cited *Lee v. Gansell,* Lofft 374, 98 Eng. Rep. 700, 705 (King's Bench 1774), as that case held:

"[A]s to the outer door, the law is now clearly taken" that it is privileged; but *the door may be broken "when the due notification and demand has been made and refused."*

(Emphasis supplied).

*Wilson v. Arkansas,* 514 U.S. at 932, 115 S.Ct. 1914, also looked to the academic authorities as it quoted from 1 Sir Matthew Hale, *Pleas of the Crown* 582:

[T]he "constant practice" at common law was that *"the officer may break open the door,* if he be sure the offender is there, *if after acquainting them of the business,* and demanding the prisoner, *he refuses to open the door."*

(Emphasis supplied).

The Supreme Court referred to 2 William Hawkins, *Pleas of the Crown,* ch. 14, § 1, p. 138 (6th ed 1787):

*"[T]he law doth never allow"* an officer to break open the door of a dwelling "but in cases of necessity," that is, *unless* he *"first signify to those in the house the cause of his coming,* and request them to give him admittance."

(Emphasis supplied).

Justice Thomas's opinion included all of this precedent as part of "the common-law principle of announcement," 514 U.S.

at 934, 115 S.Ct. 1914, and then constitutionalized it, contrasting "announced" and "unannounced" entries into a home.

> Given the longstanding common-law endorsement of *the practice of announcement,* we have little doubt that the Framers of the Fourth Amendment thought that the method of an officer's entry into a dwelling was among the factors to be considered in assessing the reasonableness of a search or seizure.... [W]e hold that *in some circumstances an officer's unannounced entry into a home might be unreasonable under the Fourth Amendment.*

*Id.* (emphasis supplied).

In discussing the exigent circumstances that might excuse the requirement of an announcement, the analysis regularly referred to the common-law "principle of announcement."

> *This is not to say that every entry must be preceded by an announcement.* The Fourth Amendment's flexible requirement of reasonableness should not be read to mandate *a rigid rule of announcement* .... *[T]he common-law principle of announcement* was never stated as an inflexible rule *requiring announcement under all circumstances.*

*Id.* (emphasis supplied).

In all of the analysis of the newly constitutionalized common-law requirement there was no mention of the physical act of knocking, let alone any suggestion that knocking was an independent requirement. *Wilson v. Arkansas* concluded:

> For now, we leave to the lower courts the task of determining *the circumstances under which an unannounced entry is reasonable under the Fourth Amendment.* We simply hold that *although a search or seizure of a dwelling might be constitutionally defective if police officers enter without prior announcement, law enforcement interests may also establish the reasonableness of an unannounced entry.*

514 U.S. at 936, 115 S.Ct. 1914 (emphasis supplied).

Between *Wilson v. Arkansas* in 1995 and *Hudson v. Michigan* in 2006, the Supreme Court dealt with the so-called "knock and announce" requirement on three other occasions.

*Richards v. Wisconsin,* 520 U.S. 385, 117 S.Ct. 1416, 137 L.Ed.2d 615 (1997), explored the quality of exigency that may justify a "no knock" entry to execute a search warrant. It required a showing of case-by-case exigency rather than a categorical exigency based upon the type of crime involved. Ironically (and proving our point), the case was analyzed as a "no knock" case notwithstanding the fact that there had been an actual and effective knock on a motel room door by an undercover police officer. What was missing was not the knock but rather an *honest announcement of police presence.* After the loud and audible knock had been responded to, the officer falsely claimed to be a maintenance man. "No knock" was obviously just the convenient linguistic label for what was, in fact, a "no announcement" entry.

*United States v. Ramirez,* 523 U.S. 65, 118 S.Ct. 992, 140 L.Ed.2d 191 (1998), dealt only with the questions of whether an exigency-based "no knock" entry requires a higher level of justification in cases in which property damage is inflicted. In referring to the pre-*Wilson* federal statute that required prior notice before making a forced entry, however, the Supreme Court pointed out that " § 2109 [of 18 U.S.C.] codifies the exceptions to *the common-law announcement requirement.*" 523 U.S. at 73, 118 S.Ct. 992 (emphasis supplied).

*United States v. Banks,* 540 U.S. 31, 124 S.Ct. 521, 157 L.Ed.2d 343 (2003), was a case in which, before entering an apartment to execute a search warrant, the police loudly knocked on the door and announced their presence. The only question was whether a subsequent delay of between 15 and 20 seconds before battering down the door was enough to satisfy the knock and announce requirement. It was. In referring to the knock and announce principle, the *Banks* Court stressed the verb "announce" and did not use the verb "knock."

[T]he standard generally requires the police *to announce their intent to search before entering* closed premises.

540 U.S. at 36, 124 S.Ct. 521 (emphasis supplied).

*Hudson v. Michigan* itself makes only passing reference to the requirements of the common-law principle, and that refer-

ence is only to *the announcement of police presence* and not to knocking.

The common-law principle that *law enforcement officers must announce their presence and provide residents an opportunity to open the door* is an ancient one.

126 S.Ct. at 2161, 165 L.Ed.2d at 63 (emphasis supplied).

Our point is that the caselaw does not support the appellee's hapless effort to make a fetish out of a mere word that has never been the basis for an actual decision and is simply a part of a familiar and convenient label. The use of a handy shorthand expression does not trigger *stare decisis*.

## B. A Federal Statute and the Common Law Doctrine

Before the Supreme Court raised the "knock and announce" requirement to constitutional status in 1995, it had twice earlier dealt with the common law doctrine that it later constitutionalized. Although in *Miller v. United States,* 357 U.S. 301, 78 S.Ct. 1190, 2 L.Ed.2d 1332 (1958), the Court was dealing with a warrantless entry of an apartment to execute a warrantless arrest, it began its analysis by noting that "the validity of the entry to execute the arrest without warrant must be tested by criteria identical with those embodied in 18 U.S.C. § 3109, which deals with entry to execute a search warrant." 357 U.S. at 306, 78 S.Ct. 1190. Section 3109, in pertinent part, provides:

*"The officer may break* open any outer or inner door or window of a house, or any part of a house, or anything therein, to execute a search warrant, *if, after notice of his authority and purpose, he is refused admittance."*

(Emphasis supplied).

In describing the common law doctrine embodied in § 3109, the Court focused on the officer's obligation "to state his authority and purpose."

Whatever the circumstances under which breaking a door to arrest for felony might be lawful, however, *the breaking*

*was unlawful where the officer failed first to state his authority and purpose* for demanding admission.

357 U.S. at 308, 78 S.Ct. 1190 (emphasis supplied).

The requirement is one of giving notice by an express announcement. The word "knock" does not even enter into the discussion.

*The rule seems to require notice in the form of an express announcement by the officers of their purpose* for demanding admission. *The burden of making an express announcement is certainly slight. A few more words by the officers would have satisfied the requirement* in this case.

357 U.S. at 309–10, 78 S.Ct. 1190 (emphasis supplied).

If notice has already been effected, moreover, the officer need not engage in "a useless gesture."

It may be that, without an express announcement of purpose, the facts known to officers would justify them in being virtually *certain that the petitioner already knows their purpose* so that *an announcement would be a useless gesture.*

357 U.S. at 310, 78 S.Ct. 1190 (emphasis supplied). What matters is the actuality of notice, not the officer's performance of a prescribed drill.

*Sabbath v. United States,* 391 U.S. 585, 88 S.Ct. 1755, 20 L.Ed.2d 828 (1968), also dealt with § 3109 and with the common law doctrine that it embodied. The references throughout the opinion were to "the rule of announcement."

[A]nother facet of *the rule of announcement* was, generally, to safeguard officers, who might be mistaken, upon *an unannounced intrusion* into a home, for someone with no right to be there.

391 U.S. at 589, 88 S.Ct. 1755 (emphasis supplied).

The evil at which § 3109 and the common-law doctrine were clearly aimed was that of an "unannounced intrusion."

*An unannounced intrusion into a dwelling*—what § 3109 basically proscribes—is no less *an unannounced intrusion*

whether officers break down a door, force open a chain lock on a partially open door, open a locked door by use of a passkey, or, as here, open a closed but unlocked door.

390 U.S. at 590, 88 S.Ct. 1209 (emphasis supplied). And see Blakey, "The Rule of Announcement and Unlawful Entry," 112 U. Pa. L.Rev. 499 (1964).

## C. Maryland Case Law

In the years since *Wilson v. Arkansas* was decided, the Court of Special Appeals has considered the new Fourth Amendment requirement on six occasions. Although all of those cases resorted to the convenient label of either "knock and announce" or "no knock," not one of them was concerned with, or even discussed, the physical phenomenon of knocking *per se:* 1) *Wynn v. State,* 117 Md.App. 133, 699 A.2d 512 (1997), *rev'd on other grounds,* 351 Md. 307, 718 A.2d 588 (1998) (The only issue was whether there was sufficient exigency to forgive the failure to make any announcement at all.); 2) *Lee v. State,* 139 Md.App. 79, 774 A.2d 1183 (2001), *aff'd,* 374 Md. 275, 821 A.2d 922 (2003) (no announcement of any sort); 3) *State v. Riley,* 147 Md.App. 113, 807 A.2d 797 (2002) (no announcement of any sort; a no-knock warrant); 4) *Davis v. State,* 144 Md.App. 144, 797 A.2d 84 (2002), *rev'd,* 383 Md. 394, 859 A.2d 1112 (2004) (no announcement of any sort; a no-knock warrant); 5) *Carroll v. State,* 149 Md.App. 598, 817 A.2d 927 (2003), *rev'd,* 383 Md. 438, 859 A.2d 1138 (2004) (no announcement of any sort); 6) *Archie v. State,* 161 Md.App. 226, 867 A.2d 1120 (2005) (a good knock and announcement followed almost immediately by a forcing of the door).

In *Carroll v. State,* 149 Md.App. at 608, 817 A.2d 927, Judge Thieme surveyed the history of the common-law doctrine and encapsulated it as a requirement that the police *announce* their authority *and demand* admittance:

Although it is tedious to tell again tales already plainly told, *police,* at common law, *were entitled to break into a house* to

arrest *after announcing their authority and purpose for demanding admission.*

(Emphasis supplied).

In *Archie v. State,* 161 Md.App. at 235–36, 867 A.2d 1120, Chief Judge Murphy similarly summarized the doctrine as one requiring the *announcement* of police presence and authority.

> In evaluating reasonableness, *courts consider "whether law enforcement officers announce[ ] their presence and authority prior to entering"* a dwelling. "It is well settled in Maryland, and long has been so, that *a police officer* executing a search warrant *'must give proper notice of his purpose and authority* and be denied admittance before he can use force to break and enter' the premises to be searched."

(Emphasis supplied).

Judge Murphy laid out the threefold reason why *unannounced* entries are presumptively unreasonable:

> The reasons behind this rule are threefold: (1) *"to prevent sudden, unannounced invasions of the privacy of citizens,"* (2) "to prevent the needless destruction of property," and (3) "to safeguard the officer who might otherwise be killed by a 'fearful householder' unaware of the officer's identity or purpose."

161 Md.App. at 236, 867 A.2d 1120 (emphasis supplied). And see Irma Raker, "The New 'No–Knock' Provision and Its Effect on the Authority of the Police to Break and Enter," 20 Amer. U.L.Rev. 467, 469 (1970–71):

> *The policy reasons* underlying the announcement rule *were to prevent sudden, unannounced invasions of the privacy of citizens,* to prevent the needless destruction of property, and to safeguard the officer who might otherwise be killed by a "fearful householder" unaware of the officer's identity or purpose.

(Emphasis supplied).

On two occasions prior to the filing of *Wilson v. Arkansas,* the Court of Special Appeals had had occasion to consider the

common-law "knock and announce" requirement. In *Waugh v. State*, 3 Md.App. 379, 239 A.2d 596 (1968), the police, in the course of executing a search warrant, "broke open the door and entered the premises without prior announcement." *Id.* at 381, 239 A.2d 596. This Court held that the exigencies justified the unannounced entry. There was no mention of the word "knock."

In *Kates v. State*, 13 Md.App. 688, 284 A.2d 651 (1971), the defendant contended that a search warrant had been "invalidly executed" because "before an officer may use force to break and enter, *he must first give proper notice of his purpose and authority* and be denied admittance." *Id.* at 692–93, 284 A.2d 651 (emphasis supplied). Chief Judge Robert Murphy rejected the contention, holding that the threat of destruction of evidence in a raid on a gambling parlor furnished all of the exigency required for an unannounced entry. The analysis, moreover, was exclusively in terms of *announcement*. There was no mention of the act of knocking *per se*.

> It is undisputed that *the officers entered the premises without prior demand* by using a passkey obtained from the manager of the apartment complex. It is well settled that *the law proscribes such unannounced searches. This rule is not*, however, *without* qualification or *exception*. As noted in *Henson v. State*, 236 Md. 518, 204 A.2d 516, *an announcement and demand are not requisite where the facts made it evident that the officers' purpose is known* or where such announcement and demand would likely frustrate the search, increase the peril of the searching officers, or permit the destruction of evidence.

*Id.* at 693, 284 A.2d 651 (emphasis supplied).

On three occasions since *Wilson v. Arkansas*, the Court of Appeals has dealt with the new constitutional requirement. In *State v. Lee*, 374 Md. 275, 821 A.2d 922 (2003), the police entered the premises without making any announcement of any sort. Chief Judge Bell summarized the general requirement, both constitutionally and in terms of the common-law

doctrine, as one premised on the obligation of the police to give *notice* of their presence and their purpose.

It is well settled in Maryland, and long has been so, that *a police officer* executing a search warrant *"must give proper notice of his purpose and authority* and be denied admittance before he can use force to break and enter" the premises to be searched.

374 Md. at 283, 821 A.2d 922 (emphasis supplied).

*Davis v. State,* 383 Md. 394, 859 A.2d 1112 (2004), dealt only with the issue of whether "no-knock" warrants were authorized under Maryland law. The phenomenon of knocking did not enter into the opinion. In *State v. Carroll,* 383 Md. 438, 859 A.2d 1138 (2004), there was no announcement of any sort, which was held to have been justified by exigent circumstances. Once again, there was no discussion of knocking.

On one occasion prior to *Wilson v. Arkansas,* the Court of Appeals considered the "knock and announce" principle as a common law doctrine. In *Henson v. State,* 236 Md. 518, 204 A.2d 516 (1964), the Court of Appeals had before it a situation in which "the police officers who executed the search warrant broke open the door of the house being searched *without first announcing who they were* and making demand that entry be granted." *Id.* at 520, 204 A.2d 516 (emphasis supplied). The Court of Appeals held that the exigencies justified such an unannounced entry.

The *Henson* Court's discussion of the common-law doctrine was not inhibited or confused by any "knock and announce" label, and the ensuing discussion made it clear that the law's concern was with police *notice* to the occupants of the place being searched and with the *announcement* of police presence and purpose as the core modality for giving notice.

The claim that the evidence seized was inadmissible because *the police officers* executing the search warrant *did not advise those within that they had such a warrant and demand admittance,* but broke in forcibly *without notice,* is an extension of the old rule that *a peace officer* seeking to arrest an individual who is in a house, either by authority of

an arrest warrant or under circumstances making a warrant unnecessary, *must give proper notice of his purpose and authority and be denied admittance before he can use force to break and enter.* The reasons for these requirements have been said to be that the law abhors unnecessary breaking or destruction of any house, because *the dweller* in the house *would not know the purpose of the person breaking in, unless he were notified,* and would have a right to resist seeming aggression on his private property. This rule of long standing has been transferred to the statute books in some twenty-five states, and in the federal law. 236 Md. at 521–22, 204 A.2d 516 (emphasis supplied).

### The Lack of a Knock Was Immaterial

When notice to the only occupant of the house to be searched was patently accomplished by the police announcement of both presence and purpose, therefore, the Fourth Amendment was, we would not hesitate to hold, fully satisfied. A purely ceremonial knock would have served no more additional purpose than a ritualistic touching of one's nose or a clicking of one's heels or a twirling about three times in a counterclockwise direction. We are not operating in Oz.

If the appellee is attempting to make some further point that the knock could have given notice to persons other than Hooks who might have been present inside the house, the overarching reality is that there were no such other persons. The knock, had it occurred, would have been heard by no one. The absence of a knock, therefore, deprived no one of notice. Demonstrably, the appellee has shown no scintilla of prejudice to anyone, let alone to himself. Excluding the evidence on the ground that there was a Fourth Amendment violation because of the absence of a knock was erroneous and, were the question properly before us, we would not hesitate to reverse it.

### Deliberate and Careful Dicta

Our examination of the Fourth Amendment merits of the police entry in this case, unfortunately, must enjoy only the

status of dicta, albeit, to be sure, that of carefully considered and deliberately articulated dicta. Even if only persuasive instead of binding, it should nonetheless be ranked in an upper percentile of persuasiveness. Our appraisal of the Fourth Amendment merits is not a holding only because we are foreclosed from ruling on the Fourth Amendment merits for two separate and independent reasons.

In the first place, the appellee lacked the standing to raise the Fourth Amendment merits. In the second place, even if we were to assume, purely *arguendo*, both standing and a Fourth Amendment violation, the harm resulting from such a violation has now been deemed by the Supreme Court to be too relatively modest and inconsequential to justify, on balance, the heavy sanction of excluding unquestionably trustworthy evidence of crime. We will look at each of these foreclosures in turn.

### Standing to Object

The issue of standing is squarely before us. At the outset of the suppression hearing, the State challenged the appellee's standing to question the police entry into 4754 Melbourne Road. The hearing judge ruled that the appellee possessed the requisite standing to litigate. The State has appealed that ruling.

■ The presence or absence of standing, of course, has nothing to do with the ultimate Fourth Amendment merits. It is exclusively a threshold question of applicability, concerned only with the coverage by the Fourth Amendment of the defendant who seeks to raise a Fourth Amendment challenge. Far from reaching the Fourth Amendment merits, standing settles only the entitlement to litigate those merits. The adjudication of a standing challenge is but a gatekeeping function.

■ The undergirding principle is that courts are established to litigate "live cases and controversies" and not to settle questions of only academic interest. That latter exercise is left to the law schools. Accordingly, one may not

litigate an alleged Fourth Amendment grievance unless one is personally aggrieved. One must show in the first instance the personal enjoyment of the Fourth Amendment protection that was allegedly violated. A defendant may not seek to vindicate vicariously the Fourth Amendment rights of someone else. *Simmons v. United States*, 390 U.S. 377, 389, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968), was emphatic in this regard.

> *[R]ights assured by the Fourth Amendment are personal rights,* and *they may be enforced* by exclusion of evidence *only at the instance of one whose own protection was infringed by the search and seizure.*

(Emphasis supplied).

## The Burden of Proof is On the Defendant

■ If the State timely challenges a defendant's standing,[8] the law is clear that, on this threshold issue, the burden is on the defendant to establish standing. In *Rakas v. Illinois*, 439 U.S. 128, 130 n. 1, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978), the Supreme Court was emphatic:

> *The proponent of a motion to suppress has the burden of establishing that his own Fourth Amendment rights were violated* by the challenged search or seizure.

(Emphasis supplied). See also *Smith v. Maryland*, 442 U.S. 735, 740, 99 S.Ct. 2577, 61 L.Ed.2d 220 (1979) ("[T]he application of the Fourth Amendment depends on whether the person invoking its protection can claim a 'justifiable,' a 'reasonable,' or a 'legitimate expectation of privacy' that has been invaded by government action."); *Rawlings v. Kentucky*, 448 U.S. 98, 104, 100 S.Ct. 2556, 65 L.Ed.2d 633 (1980) ("Petitioner, of

---

8. If the State fails to raise a timely challenge, on the other hand, it is out of luck and may not raise the challenge on later review. This is because the standing requirement, albeit incidentally beneficial to the State, is not for the benefit of the State. The requirement primarily serves the interest of judicial economy. It is to save busy courts from having to waste time and resources litigating matters that need not be litigated. Once such litigation has taken place because the State was asleep at the switch, however, it is too late for a standing challenge to accomplish the purpose for which it is designed. *Steagald v. United States*, 451 U.S. 204, 208–09, 101 S.Ct. 1642, 68 L.Ed.2d 38 (1981).

course, bears the burden of proving not only that the search of Cox's purse was illegal, but also that he had a legitimate expectation of privacy in that purse.").

This Court is firmly in line with that allocation of the burden of proof. In *Alston v. State*, 159 Md.App. 253, 262–63, 858 A.2d 1100 (2004), Judge Deborah Eyler stated unequivocally:

> *The burden is on the proponent of a motion to suppress evidence on Fourth Amendment grounds to prove what is sometimes called "standing"*—that he had a reasonable expectation of privacy in the premises or the property. . . . [T]he motion court in this case found that *the appellant did not show that he had standing* to assert a Fourth Amendment violation.

(Emphasis supplied). See also *Simpson v. State*, 121 Md.App. 263, 276, 708 A.2d 1126 (1998) ("The burden is on the proponent of a motion to suppress evidence allegedly seized as a result of a constitutional violation to establish that he has standing to complain of a constitutional violation."); *Burks v. State*, 96 Md.App. 173, 195, 624 A.2d 1257 (1993) ("The burden of showing Fourth Amendment coverage is, of course, upon the appellant."), *cert. denied*, 332 Md. 381, 631 A.2d 451 (1993).

The Court of Appeals has also spoken to the same effect in *Laney v. State*, 379 Md. 522, 545, 842 A.2d 773 (2004):

> *The one invoking Fourth Amendment protection bears the burden of demonstrating his or her legitimate expectation of privacy* in the place searched or items seized.

(Emphasis supplied). And see *Ricks v. State*, 312 Md. 11, 26, 537 A.2d 612 (1988) ("[T]he proponent of a motion to suppress has the burden of establishing that his Fourth Amendment rights were violated by the challenged search and seizure.").

In this regard, we find interesting two sentences in the appellee's brief.

> Appellee points out that *there was no evidence presented by the State* during the hearing that shows Appellee didn't have the authority to exclude others from the dwelling or that he didn't take steps to maintain his privacy. Moreover, *the*

*State failed to present evidence* showing that Appellee strictly used the dwelling to store and package drugs. (Emphasis supplied). That argument turns the allocation of the burden of proof completely on its head. We, however, will apply it right side up. The burden is on the defendant to show standing; it is not on the State to show non-standing.

## The Varieties of Fourth Amendment Standing

For all intents and purposes, the law of Fourth Amendment standing began with *Jones v. United States,* 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960). Prior to *Jones,* the only variety of Fourth Amendment standing that had been recognized was the self-evident situation in which a defendant had a possessory or other proprietary interest in the place searched and/or the thing seized. The defendant was required to show some sort of property right. See *Burks v. State,* 96 Md.App. at 194, 624 A.2d 1257.

*Jones,* in 1960, significantly liberalized the law of standing by adding two additional varieties: 1) automatic standing, for cases in which the State charged the defendant with a crime with respect to which the very possession of the thing seized was the gravamen of the offense; and 2) derivative standing, for cases in which the defendant was "legitimately on the premises" searched as the guest, licensee, or invitee of the owner or rightful possessor. This latter was called "derivative standing" because it derived through the property owner to the guest. The guest merely enjoyed, to some extent, what the host enjoyed. The right of the guest was never independent of that of the host. If the host, for instance, consented to a police entry, that would override any objection on the part of the guest. The guest's right was truly derivative. *Burks v. State,* 96 Md.App. at 194, 624 A.2d 1257.

Automatic standing enjoyed a shelf life of only twenty years. The handwriting of its imminent demise was inscribed on the wall by *Simmons v. United States,* 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968). By granting a defendant the benefit of use immunity for his testimony at a suppression hearing,

*Simmons* removed the defendant from what had theretofore been called "the horns of the dilemma." Automatic standing's official obituary was pronounced by *United States v. Salvucci*, 448 U.S. 83, 95, 100 S.Ct. 2547, 65 L.Ed.2d 619 (1980). Only proprietary standing and "derivative" standing remained, and they were now cloaked in the language of *Katz v. United States* (see *infra* ).

## The Rejection of Target Standing

In the meantime, however, creative defense attorneys persistently argued for yet another variety of standing, one which came to be called target standing. The theory was that the defendant's status as the target of an investigation should confer standing in him to challenge any search or seizure that was a part of that investigation. The Supreme Court regularly rejected target standing as a launching pad for raising a Fourth Amendment challenge.

There appears to be a possibility, however, that the notion of target standing was at least a factor in the trial court's decision to exclude the evidence in this case. The State moved for a ruling that the appellee lacked Fourth Amendment standing. Although the hearing court went on to a discussion of the reasonable expectation of privacy, the ruling began:

> THE COURT: Motion is denied. *The Defendant was the object of the investigation.*

(Emphasis supplied). That is the language of target standing.

*Rakas v. Illinois*, 439 U.S. at 132, 99 S.Ct. 421, directly addressed the subject of target standing.

> Petitioners first urge us to relax or broaden the rule of standing enunciated in *Jones v. United States* . . ., so that any criminal defendant at whom a search was "directed" would have standing to contest the legality of that search and object to the admission at trial of evidence obtained as a result of the search.

The Supreme Court pointed out that such a theory would permit a defendant to vindicate vicariously the Fourth Amend-

ment rights of someone else, something that the Court had never countenanced.

*Adoption of the so-called "target" theory* advanced by petitioner *would* in effect *permit a defendant to assert* that a violation of *the Fourth Amendment rights of a third party* entitled him to have evidence suppressed at his trial.

439 U.S. at 132–33, 99 S.Ct. 421 (emphasis supplied).

The Supreme Court engaged in an extensive analysis, 439 U.S. at 132–38, 99 S.Ct. 421, of why it had always historically rejected, and would continue to reject, target standing. The rejection was emphatic.

We decline to extend the rule of standing in Fourth Amendment cases in the manner suggested by petitioners. As we stated in *Alderman v. United States* ... (1969): *"Fourth Amendment rights* are personal rights which, like some other constitutional rights, *may not be vicariously asserted."*

439 U.S. at 133, 99 S.Ct. 421 (emphasis supplied).

*United States v. Padilla,* 508 U.S. 77, 82, 113 S.Ct. 1936, 123 L.Ed.2d 635 (1993), reaffirmed that the only varieties of standing are those based on 1) a property interest or 2) a reasonable expectation of privacy.

*Expectations of privacy and property interests govern the analysis of Fourth Amendment search and seizure claims.* Participants in a criminal conspiracy may have such expectations or interests, but the conspiracy itself neither adds to nor detracts from them.... The case is remanded so that *the court may consider whether each respondent had either a property interest* protected by the Fourth Amendment that was interfered with ... *or a reasonable expectation of privacy* that was invaded by the search thereof.

(Emphasis supplied).

## The *Katz–Rakas* Reformulation

*Rakas v. Illinois* in 1978 is almost certainly the most significant analysis the Supreme Court has ever delivered on Fourth Amendment standing. At the very least, it was the

most significant statement since *Jones v. United States* in 1960. In addition to 1) making clear that the burden of proof on standing is allocated to the defendant and 2) rejecting the very notion of target standing, the Court completely recast the language with which we talk about standing.

The *Katz–Rakas* reformulation of what constitutes Fourth Amendment coverage was, in effect, a necessary refitting after an eighteen-year shake-down cruise. The "reasonable expectation of privacy" language had the salutary effect of being far more nuanced than the "legitimately on the premises" formulation of *Jones* that had preceded it. That formulation could readily be, and almost always was, treated as an "all or nothing" phenomenon, an approach ill-suited to the infinite variety of real life. *Rakas*'s reliance on the totality of the circumstances, by contrast, permitted adjustments, upward and downward, within shifting shades of gray that the "black or white" dichotomy of *Jones* had not.

Even after *Rakas,* standing remains, of course, a Fourth Amendment threshold issue. If a defendant can show that he personally enjoyed a Fourth Amendment protection, he thereby has the standing to litigate an alleged violation of that protection. Conversely, if a defendant cannot show that he possessed a Fourth Amendment right, he has no standing to litigate the alleged violation of the right. These core verities have never changed.

 What has changed, since *Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), is the language used to describe the existence of a Fourth Amendment right. If, under the totality of the circumstances, one is now deemed to have "a reasonable expectation of privacy," that means that one thereby has a Fourth Amendment right and, for that precise reason, has the standing to litigate an alleged violation of that right. Conversely, if one does not have "a reasonable expectation of privacy," that simply means that one does not have a Fourth Amendment right and, for that reason, has no standing to litigate an alleged violation of a non-existent right. A reasonable expectation of privacy equals a Fourth Amend-

ment right equals standing to vindicate that right. A equals B equals C.

This identity between the expectation of privacy issue and the standing issue was perfectly expressed by Judge Battaglia in *Whiting v. State*, 389 Md. 334, 337, 885 A.2d 785 (2005):

[A]lthough Whiting did possess a subjective expectation of privacy ... *his expectation of privacy was not objectively reasonable,* and *as a result, he did not have standing* under the Fourth Amendment *to challenge the searches.*

(Emphasis supplied).

As the measuring rod for the existence of a Fourth Amendment right, with the attendant standing to litigate that right, the "reasonable expectation of privacy" criterion theoretically embraces both 1) proprietary standing and 2) derivative standing, to use the pre-*Rakas* terms. Although both concepts are now subsumed in the generic *Katz–Rakas* formulation, an understanding of the distinction between them remains a helpful analytic tool.

In terms of the objective component of the reasonable expectation of privacy test, one who enjoys an actual possessory or proprietary interest in the place searched or the thing seized invariably has no problem. An expectation of privacy by such a person is almost as a matter of course deemed to be objectively reasonable. Conversely, when a defendant who has claimed standing pursuant to an ostensible property right is shown to have no such property right, that is invariably fatal to the defendant's claim of standing. *Laney v. State*, 379 Md. 522, 842 A.2d 773 (2004) (mortgagor of a home that had been foreclosed upon); *Whiting v. State*, 389 Md. 334, 885 A.2d 785 (2005) (squatter in a vacant house). Claims of proprietary standing, good or bad, pose little problem.

It is only when we come to the more diluted expectations of privacy, expectations by those we once characterized as having only derivative standing, that the objective measuring of reasonableness becomes more problematic. An expectation of privacy may take various forms, and it is with respect to the

variety once known as derivative standing that the *Rakas v. Illinois* reformulation has had its major impact.

### The Appellee Had No Proprietary Standing

First, to clear away some of the clutter, we can resolve the issue of the appellee's lack of proprietary standing in a hurry. There was no shred of evidence to establish any proprietary interest of any sort on the part of the appellee in 4754 Melbourne Road. Indeed, the appellee stated to the police that he lived at 2918 Lake Brook Circle. 4754 Melbourne Road was the home of Walter Hooks's mother, who lived there with her daughter. She apparently tolerated the periodic presence of her son, Walter Hooks, although she "was trying to get rid of him because he kept getting in trouble." Hooks himself gave his address as 2313 West Mosher Street. In ruling on the standing issue, the trial court began with the finding, "We have no evidence of ownership." We fully agree.

### The Reasonable Expectation of Privacy And Derivative Standing

Lacking proprietary standing, the appellee, at most, could claim what, pre-*Rakas*, might have amounted to derivative standing. Walter Hooks presumably spent some time at 4754 Melbourne Road with the grudging permission of his mother. The appellee inferentially spent some daylight hours at that address with the permission of Walter Hooks. Whatever the appellee enjoyed was derived through Walter Hooks. The issue, post-*Rakas*, is whether the circumstances of his presence there conferred on him an objectively reasonable expectation of privacy in those premises.

■ It is clear that to enjoy Fourth Amendment standing, a defendant must have both 1) an actual subjective expectation of privacy and 2) an expectation that is objectively reasonable. It is now hornbook law that the *Katz* reasonable expectation of privacy test is two-pronged. *Minnesota v. Carter,* 525 U.S. 83, 88, 119 S.Ct. 469, 142 L.Ed.2d 373 (1998), set out the dual requirements.

[I]n order to claim the protection of the Fourth Amendment, *a defendant must demonstrate that he personally has an expectation* of privacy in the place searched, *and that his expectation is reasonable.*

(Emphasis supplied).

In *Laney v. State,* 379 Md. 522, 545, 842 A.2d 773 (2004), the Court of Appeals similarly laid out the two-pronged test: *The burden consists of two inquiries:* (1) whether the individual has *a subjective expectation* that his or her property or possessions will not be searched, and (2) whether *the expectation is objectively reasonable* under the circumstances.

(Emphasis supplied).

In *Ricks v. State,* 312 Md. at 26–27, 537 A.2d 612, Chief Judge Robert Murphy described the two-pronged nature of the criterion.

The determination whether *a legitimate expectation of privacy exists embraces two discrete questions,* viz: *the first is whether the individual,* by his conduct, *has exhibited a subjective expectation of privacy* (that he seeks to preserve something as private), and *the second question is whether the individual's subjective expectation of privacy is one that society is prepared to recognize as reasonable* (whether the individual's expectation, viewed objectively, is justifiable under the circumstances). *A legitimate "expectation of privacy by definition means more than a subjective expectation of not being discovered."*

(Emphasis supplied).

### A Subjective Expectation Alone Will Not Suffice

The decision of the hearing court in this case appears to have been a ruling with respect to the appellee's subjective expectation of privacy, but not a ruling as to whether that subjective expectation was one that society would objectively consider to be reasonable or legitimate. The ruling was:

What little evidence we have is that he was using this place regularly. There's no evidence that it was abandoned prop-

erty or anything else. He was operating out of this house. *I think common sense tells you that one would not be conducting the type of operation that is alleged without expecting—reasonably expecting to have some privacy.*

(Emphasis supplied). That reference was almost certainly to a subjective expectation on the part of the appellee that his criminal activity would not be discovered.

*Rakas v. Illinois* itself explained why such a subjective expectation, standing alone, will never be sufficient to establish standing.

*[A] "legitimate" expectation of privacy by definition means more than a subjective expectation of not being discovered. A burglar plying his trade in a summer cabin during the off season may have a thoroughly justified subjective expectation of privacy, but it is not one which the law recognizes as "legitimate."*

439 U.S. at 143 n. 12, 99 S.Ct. 421 (emphasis supplied).

*Alston v. State,* 159 Md.App. at 262, 858 A.2d 1100, also referred to the inadequacy of the subjective expectation of not being discovered as a sufficient predicate to establish standing.

Fourth Amendment coverage only applies, and hence a violation only may be asserted, when the person asserting the violation had a reasonable expectation of privacy in the area invaded at the time of the search. *A reasonable expectation of privacy is one society is prepared to recognize as reasonable. This requires "more than a subjective expectation of not being discovered."*

(Emphasis supplied).

### What Makes an Expectation of Privacy Objectively Reasonable?

As we now narrow the focus, we are looking at an objectively reasonable expectation of privacy by one who is the guest of someone else on someone else's property. This is the secondary status of protection that *Jones* referred to as "being legitimately on the premises" or what many, pre-*Rakas,* re-

ferred to as derivative standing. In the *Jones* case itself, this new and liberalized variety of standing was afforded to Jones, who "had been given the use of the apartment by a friend. He had clothing in the apartment, had slept there 'maybe a night,' and at the time was the sole occupant of the apartment." *Minnesota v. Carter*, 525 U.S. at 89, 119 S.Ct. 469.

In the wake of *Jones*, however, there was a widespread, almost universal, tendency to extend derivative standing to anyone who, in the words of *Jones*, was "legitimately on the premises." The entitlement to litigate an alleged Fourth Amendment violation seemed, applying that phraseology literally, to reach not only the long term guest with a suitcase under the bed in the guest room but also the mailman three feet inside the back door collecting the postage due on a letter. Both, after all, were "legitimately on the premises." Such a reading of *Jones*, however, was a case of the pendulum's having swung too far.

The correction of course came in 1978. Looking to the totality of the circumstances and insisting on an *ad hoc* determination on a case-by-case basis, *Rakas v. Illinois* drastically trimmed back that "overbroad" categorical conferral of standing on everyone legitimately present on someone else's property. *Minnesota v. Carter*, 525 U.S. at 89–90, 119 S.Ct. 469, characterized this cut-back:

> [W]hile the holding of Jones—that a search of the apartment violated the defendant's Fourth Amendment rights—is still valid, its statement that "anyone legitimately on the premises where a search occurs may challenge its legality," was expressly repudiated in Rakas v. Illinois. Thus, an overnight guest in a home may claim the protection of the Fourth Amendment but one who is merely present with the consent of the householder may not.

(Emphasis supplied).

The Supreme Court in *Rakas* made it clear that that language of *Jones* was much too broad.

We do not question the conclusion in *Jones* that the defendant in that case suffered a violation of his personal

Fourth Amendment rights if the search in question was unlawful. Nonetheless, we believe that *the phrase "legitimately on premises" coined in Jones creates too broad a gauge for measurement of Fourth Amendment rights.*

439 U.S. at 141–42, 439 U.S. 128 (emphasis supplied).

The Court went on to explain why such an overly generous extension of standing to all who happened to be "legitimately on the premises" would serve no valuable Fourth Amendment purpose.

[A]pplied literally, *this statement would permit a casual visitor* who has never seen, or been permitted to visit the basement of another's house *to object to a search of the basement if the visitor happened to be in the kitchen of the house at the time of the search.* Likewise, *a casual visitor who walks into a house one minute before a search of the house* commences and leaves one minute after the search ends *would be able to contest the legality of the search.* The first visitor would have absolutely no interest or legitimate expectation of privacy in the basement, the second would have none in the house, and *it advances no purpose served by the Fourth Amendment to permit either of them to object to the lawfulness of the search.*

439 U.S. at 142, 99 S.Ct. 421 (emphasis supplied).

The *Jones* formulation of the test was squarely repudiated.

*[T]he Jones statement* that a person need only be "legitimately on premises" in order to challenge the validity of the search of a dwelling place *cannot be taken in its full sweep beyond the facts of that case.*

439 U.S. at 143, 99 S.Ct. 421 (emphasis supplied).

Justice Rehnquist's opinion explained how the "reasonable expectation of privacy" language of *Katz v. United States* "provides guidance in defining the scope of the interest protected by the Fourth Amendment" and then recast the holding of *Jones* in the language of *Katz.*

Viewed in this manner, the holding in *Jones* can best be explained by the fact that *Jones had a legitimate expecta-*

*tion of privacy in the premises he was using and* therefore *could claim the protection of the Fourth Amendment* with respect to a governmental invasion of those premises, *even though his "interest"* in those premises *might not have been a recognized property interest at common law.*

*Id.* (emphasis supplied).

 Being legitimately on the premises remains a factor, of course, but not a dispositive one. It is now only one factor in a larger totality.

We would not wish to be understood as saying that *legitimate presence on the premises* is irrelevant to one's expectation of privacy, but it *cannot be deemed controlling.*

439 U.S. at 148, 99 S.Ct. 421 (emphasis supplied).

In the *Rakas* case itself, the petitioners Rakas and King were legitimately in the automobile of a third person. Their status as mere, albeit legitimate, passengers did not give them standing to litigate the warrantless search of the automobile.[9]

[P]etitioners' claims must fail. *They asserted neither a property nor a possessory interest in the automobile,* nor an interest in the property seized. And as we have previously indicated, *the fact* that they were "legitimately on [the] premises" in the sense *that they were in the car with the permission of its owner is not determinative of whether they had a legitimate expectation of privacy* in the particular areas of the automobile searched.

*Id.* (emphasis supplied). Something more was required.

### Minnesota v. Olson

Just as World War II artillery men bracketed a target by moving progressively inward from alternating undershots and overshots, the Supreme Court has bracketed our target tightly

---

**9.** This is not to say, of course, that a passenger who is more than a "mere passenger" might not have standing to litigate a search of someone else's automobile. A member of the family, for instance, or one on a week-long cross country trip with a suitcase in the trunk would be more than a mere passenger. Many factors may enter into the totality.

between *Minnesota v. Olson,* 495 U.S. 91, 110 S.Ct. 1684, 109 L.Ed.2d 85 (1990), and *Minnesota v. Carter,* 525 U.S. 83, 119 S.Ct. 469, 142 L.Ed.2d 373 (1998).

To switch metaphors, *Minnesota v. Olson* is the positive pole. It is the exemplary instance of when being legitimately on the premises of another will be deemed an objectively reasonable expectation of privacy. Olson was "staying" at the apartment of two friends, a mother and daughter, and had, at the time of the police entry, slept there for at least one night. He had a change of clothes with him. The Supreme Court's holding was clear.

> *Olson's status as an overnight guest is alone enough to show* that he had *an expectation of privacy* in the home *that society is prepared to recognize as reasonable.*

495 U.S. at 96–97, 110 S.Ct. 1684 (emphasis supplied).

Justice White's analysis showed how very similar Olson's situation was to that in *Jones v. United States,* as, 495 U.S. at 97, 110 S.Ct. 1684, he quoted from that earlier opinion, 362 U.S. at 259, 80 S.Ct. 725.

> "*[Jones] testified that the apartment belonged to a friend, Evans, who had given him the use of it, and a key,* with which [Jones] had admitted himself on the day of the arrest. On cross-examination *[Jones] testified that he had a suit and shirt at the apartment,* that his home was elsewhere, that he paid nothing for the use of the apartment, that *Evans had let him use it 'as a friend,' that he had slept there 'maybe a night,'* and that at the time of the search Evans had been away in Philadelphia for about five days."

(Emphasis supplied).

The Court in *Olson* explained why the overnight guest's expectation of privacy is recognized as reasonable.

> *To hold that an overnight guest has a legitimate expectation of privacy in his host's home merely recognizes the everyday expectations of privacy that we all share. Staying overnight in another's home is a longstanding social custom that serves functions recognized as valuable by society.* We stay in others' homes when we travel to a

strange city for business or pleasure, when we visit our parents, children and more distant relatives out of town, when we are in between jobs or homes, or when we house-sit for a friend. *We will all be hosts and we will all be guests many times in our lives.* From either perspective, we think that *society recognizes that a houseguest has a legitimate expectation of privacy in his host's home.*

495 U.S. at 98, 110 S.Ct. 1684 (emphasis supplied).

With *Minnesota v. Olson* as the benchmark, *Alston v. State,* 159 Md.App. 253, 858 A.2d 1100 (2004), is instructive as an instance of falling short of that benchmark. The place the police warrantlessly entered was the basement apartment of one Christy Dean, who at the time of entry was asleep on a makeshift bed. Alston, who moments before had been observed outside by the police as a possible dope dealer, was first seen holding a semi-automatic handgun, then ran into Christy Dean's basement apartment, and shortly thereafter ran out again without the gun. The police searched the apartment and found the gun.

The State challenged *Alston's* standing to raise a Fourth Amendment challenge. The appellant, who had had a permanent address elsewhere for 16 years, claimed that he had an "intimate" relationship with Christy Dean and that he had been going to her basement apartment to see her "for a couple of months." He claimed to have "spent the night at her apartment" from "time to time." He "sometimes" stayed there for the whole night. 159 Md.App. at 260, 858 A.2d 1100. On the other hand, Alston did not keep any of his belongings there and did not have a key. He did not receive mail there nor have a telephone there. *Id.*

Judge Deborah Eyler's opinion looked to *Minnesota v. Olson* for guidance. After noting that the burden of proof was squarely on Alston, the opinion described how Alston had failed to carry that burden.

In this case, by contrast, *there was no factual finding that the appellant was an overnight guest of Dean at the time of the search. The appellant did not testify that he*

*was an overnight guest of Dean that night.* His testimony was that "from time to time" he was an overnight guest of Dean: that is, sometimes he stayed overnight with her; more often he visited her without spending the night; and for periods he did not visit her at all. Certainly, *that testimony did not compel a factual finding that the appellant occupied the status of an overnight guest* of Dean on October 10, 2002.

159 Md.App. at 264, 858 A.2d 1100 (emphasis supplied).

In contrast to the appellee in this case, who did not testify at all, Alston did at least testify, albeit very inadequately and only in general terms.

*The appellant's testimony did not offer any factual detail about his connection to 54 West Talbot Street on the night in question.* He did not testify that he had been inside the apartment visiting Dean at any time on the day or evening in question or that he was planning to go inside the apartment or to stay with Dean that night. As discussed above, *it was the appellant's burden to adduce evidence showing his status vis-à-vis the premises.* It is telling that the appellant did *not* testify that he even visited Dean or was inside her apartment on October 10, 2002, giving only general information about his visiting habits.

*Id.* (emphasis supplied).

After thoroughly surveying the national caselaw, this Court concluded:

*The appellant's status as an occasional overnight guest of Dean who did not have the present status of an overnight guest* and entered Dean's apartment in the course of fleeing from the police, to deposit evidence, *did not give him an objectively reasonable expectation of privacy in Dean's apartment:* that is, one that society is willing to recognize. Accordingly, *he did not have standing to challenge the admission of the handgun into evidence on Fourth Amend-*

*ment grounds,* and the court properly denied his suppression motion.

159 Md.App. at 268, 858 A.2d 1100 (emphasis supplied).

### *Minnesota v. Carter*

If *Minnesota v. Olson* is the positive pole, *Minnesota v. Carter* is the negative pole. Whereas *Minnesota v. Olson* had held that an individual, legitimately in the home of someone else, did enjoy a Fourth Amendment protection, *Minnesota v. Carter* held that the two petitioners there, also legitimately on the premises of someone else, did not enjoy a Fourth Amendment protection.

*Minnesota v. Carter* was the acid test for *Rakas v. Illinois's* announcement that everyone "legitimately on the premises" of someone else does not necessarily enjoy an objectively recognized reasonable expectation of privacy while on those premises. The holding of *Rakas* that a mere passenger in an automobile, albeit legitimately present, did not possess a Fourth Amendment protection in that automobile was vulnerable to being distinguished on the ground that it only applied to automobiles, with their lesser expectation of privacy. *Minnesota v. Carter* involved a residential apartment and its holding could not be so readily distinguished.

■ The contrast between *Minnesota v. Olson* and *Minnesota v. Carter* lightens the path as we wend our way through subtle shades of gray. The law keeps a weather eye on the protection of the home as the core Fourth Amendment value. In Sir William Pitt's classic articulation that an "Englishman's home is his castle," the subject of the castle-like protection is the "home." There is the animating notion of a zone of habitation into which an individual or a family may retreat from the world in order to eat, to sleep, to relax, to socialize with friends in familial seclusion. In assessing, therefore, which expectations of privacy by those legitimately present on someone else's premises are objectively so reasonable and legitimate as to be worthy of constitutional protection, the law looks to such factors as the nature of the

relationship between guest and host and the nature of the activity being engaged in by the guest while on the premises.

Whereas Olson had been the overnight guest of two friends in their apartment, the petitioners in *Minnesota v. Carter* were "sitting in one of [the apartment's] rooms, bagging cocaine." 525 U.S. at 85, 119 S.Ct. 469. The petitioners "had come to the apartment for the sole purpose of packaging the cocaine" and "were only in the apartment for approximately 2 1/2 hours." The lessee of the apartment had allowed the petitioners to use it in exchange for "one-eighth of an ounce of the cocaine." 525 U.S. at 86, 119 S.Ct. 469. Reversing both the trial court and the intermediate Court of Appeals, the Minnesota Supreme Court, 569 N.W.2d 169, 176 (1997), held that the petitioners enjoyed Fourth Amendment standing.

> [Even though] society does not recognize as valuable the task of bagging cocaine, we conclude that society does recognize as valuable the right of property owners or lease-holders to invite persons into the privacy of their homes to conduct a common task, be it legal or illegal activity. We, therefore, hold that [respondents] had standing to bring [their] motion to suppress the evidence gathered as a result of Thielen's observations.

The United States Supreme Court reversed that decision. It stressed the brevity of the petitioners' stay, the fact that the petitioners were not overnight guests, and the lack of any previous connection between guests and host.

> *Respondents here were obviously not overnight guests, but were* essentially *present for a business transaction* and were only in the home a matter of hours. *There is no suggestion that they had a previous relationship with Thompson,* or that there was any other purpose to their visit.

525 U.S. at 90, 119 S.Ct. 469 (emphasis supplied). Chief Justice Rehnquist's opinion observed that there was nothing, such as staying the night, "to suggest a degree of acceptance into the household."

*Nor was there anything* similar to the overnight guest relationship in *Olson to suggest a degree of acceptance into the household.* While the apartment was a dwelling place for Thompson, *it was for these respondents simply a place to do business.*

*Id.* (emphasis supplied).

■ That was the very opposite of the situation in *Minnesota v. Olson* wherein Olson had been welcomed into the household circle of his hosts. The petitioners in *Carter,* by contrast, were simply on the premises for a commercial purpose, a purpose that generates a significantly lesser expectation of privacy.

*Property used for commercial purposes is treated differently* for Fourth Amendment purposes *from residential property.* "An expectation of privacy in commercial premises, however, *is* different from, and indeed *less than, a similar expectation in an individual's home." New York v. Burger,* 482 U.S. 691, 700, 107 S.Ct. 2636, 96 L.Ed.2d 601 (1987). And *while it was a "home" in which respondents were present, it was not their home.*

(Emphasis supplied).

The Supreme Court contrasted the situation before it in *Carter* with that in *Minnesota v. Olson* and held that being "legitimately on the premises" for a purely commercial purpose was not enough to confer on the petitioners the protection of the Fourth Amendment.

If we regard *the overnight guest* in *Minnesota v. Olson* as typifying those who *may claim the protection of the Fourth Amendment* in the home of another, and *one merely "legitimately on the premises"* as typifying those who *may not do so,* the present case is obviously somewhere in between. But *the purely commercial nature of the transaction engaged in here,* the relatively short period of time on the premises, and *the lack of any previous connection between respondents and the householder,* all lead us to conclude that *respondents' situation is closer to that of one simply permitted on the premises.* We therefore hold that *any*

*search which may have occurred did not violate their Fourth Amendment rights.*

525 U.S. at 91, 119 S.Ct. 469 (emphasis supplied).

### Appellee's Expectation of Privacy Was Not Objectively Reasonable or Legitimate

As with *Rakas v. Illinois*'s example, 439 U.S. at 143 n. 12, 99 S.Ct. 421, of a "burglar plying his trade in a summer cabin during the off season," the appellee here may have had "a thoroughly justified subjective expectation of privacy," but it was, we hold, "not one which the law recognizes as legitimate."

All of the evidence bearing on the appellee's standing came from the application for the search warrant. We look first at the extent of the appellee's connection with 4754 Melbourne Road. Although the hearing judge found that the appellee "was using the place regularly," the evidence provides no support for such a conclusion. The only information as to time and place came from "a reliable informant" during the month of June 2004. The information was that the appellee was distributing drugs in the Yale Heights area of Baltimore City. The distribution sites were described as 1) the 1900 block of Hollins Street, 2) the 300 block of Monroe Street, and 3) the 1900 block of Frederick Avenue. The informant had been present in those areas when the appellee "dropped off large quantities of heroin to street level dealers to sell in the area." There was no information linking the appellee in any way to 4754 Melbourne Road.

The first information dealing with packaging rather than distributing only came on June 22, the day of the search and seizure in question. The information was that the appellee "was at an unknown location in the Yale Heights area of Baltimore City packaging up a large quantity of heroin." The only further information from the informant was that the appellee "is driving a white Riviera with Maryland temporary plates and white wall tires." The police drove to the area and

"observed the vehicle fitting that description parked in the rear of 4754 Melbourne Road."

The appellee's first known connection with the premises thus began at some time on the late morning or very early afternoon of June 22. At 12:25 p.m., the appellee was observed to leave the house and drive off in the Riviera. He was subsequently spotted near his drug distribution sites on Hollins Street and South Monroe Street, but the police lost contact. At 12:45 p.m. the appellant drove back to the rear of 4754 Melbourne Road and reentered the house. The appellee left the house again at "around 3:00 p.m." He was stopped by the police while still in the area and "given his *Miranda* rights." He "denied ever being inside of 4754 Melbourne Road" and "also advised that he has nothing to do with anything found inside of 4754 Melbourne Road." He was not on the premises at the time of the police entry.

This was the full extent of the evidence bearing on the appellee's contact with 4754 Melbourne Road. It was on a single day and during daylight hours. It lasted for two hours and fifteen minutes plus an undetermined period of time on the front end of the surveillance. There was no evidence of any overnight stay. There was no evidence of the appellee's having clothing or any other personal belongings in the house.

There was, moreover, no evidence of any relationship between the appellee and anyone in the house. Walter Hooks, the appellee's co-defendant, took the stand at the suppression hearing, but was asked absolutely nothing, by the appellee's attorney or anyone else, about any relationship or even passing contact with the appellee. In this case, the appellee may not even argue that he was the guest of the homeowner. There was no suggestion that he even knew the elder Mrs. Hooks or that Mrs. Hooks knew him. In view of the tenuous, albeit tolerated, status of Walter Hooks, the appellee was, at best, the guest of a guest. That is a far cry from the "acceptance into the household" referred to by *Minnesota v. Carter*, 525 U.S. at 90, 119 S.Ct. 469.

As to the nature of the activity engaged in by the appellee while on the premises, the information from the informant was that the appellee was "packaging up a large quantity of heroin." That is indistinguishable from the "bagging of cocaine" that was held by *Minnesota v. Carter* to be insufficient to create a legitimate expectation of privacy.

### Simpson v. State

This Court actually anticipated *Minnesota v. Carter* by seven months with our decision in *Simpson v. State*, 121 Md.App. 263, 708 A.2d 1126 (1998). In that case, as in this, the defendant was simply one who was "legitimately on the premises" of a house identified by a confidential informant as a "stash house" for drugs. The defendant there, as the appellee here, sought to establish the standing to raise a Fourth Amendment challenge.

A lawful occupant of the house was Cherese Rogers. The defendant testified at the suppression hearing that "he went to Rogers's house to have sex with her." He claimed to have been there "two or three times previously" for that purpose. *Id.* at 274, 708 A.2d 1126. After explaining that the burden of proof is on the defendant to prove standing, Judge Alpert's opinion pointed out that "mere presence of a criminal defendant at the site of a search is insufficient to show that his rights were violated." *Id.* at 277, 708 A.2d 1126.

The defendant in *Simpson* argued that being on the premises to have sexual relations with the lawful occupant should be enough to confer a reasonable expectation of privacy. One might think that two people, possibly naked and on a bed and wishing to shut out the rest of the world, would have such a legitimate expectation. This Court held otherwise.

*Appellant next contends that because he went to Rogers's room to have sexual relations, and because society believes that sexual relations should be carried out in private, he therefore had a subjective expectation of privacy in Rogers's bedroom sufficient to confer standing. The State contends that appellant's connection with the room, even if appellant were to be believed, was insufficient to allow him sufficient*

expectation of privacy to have *standing. We agree with the State.*

*Id.* at 280, 708 A.2d 1126 (emphasis added).

Very significant in that case was what the defendant had not proved.

In the present case, *appellant had been to the premises, at most, a few times before the date of the search.* Regardless of whether the trial court believed Rogers or appellant, *appellant had been in Rogers's room only a short time* before the police entered *and was not expected to stay for a prolonged period. Appellant did not store any personal belongings in the room. He did not have a key* to the premises. He had no right to be on the premises without Rogers or Steele present and he had no right to exclude others, including Rogers's live-in boyfriend, from the room. *We do not believe that appellant's connection to the premises was sufficient to establish a legitimate expectation of privacy.*

*Id.* (emphasis supplied).

The defendant in *Simpson* failed to persuade the judge as to existence of any of those factors. The appellee here did not even try. Unlike a defendant at a trial on the merits who can put the State to its burden of proof, it is the defendant who bears that burden on the threshold question of standing. Although standing can theoretically be established without a defendant's testimony, it is a lot harder to establish than if such testimony were provided. As a reason for not testifying, a defendant may no longer hide behind the risk of self-incrimination, since *Simmons v. United States,* 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968), held that testimony given at a suppression hearing may not be used against a defendant at a trial on the merits of guilt or innocence. The appellee here, with no reason to remain silent, offered proof of nothing.

This Court in *Simpson* frowned even on illicit sexual activity as giving rise to an expectation of privacy that society would objectively deem to be legitimate.

> The evidence, rather, established that *if appellant did expect to have sexual relations with Rogers, he was soliciting prostitution. Given the absence of any other indicia of standing* in and to the premises, as discussed above, *the appellant's mere subjective expectation of privacy,* standing alone, *was not one that society is prepared to accept as reasonable.*

121 Md.App. at 281, 708 A.2d 1126 (emphasis supplied).

The opinion flatly foreclosed a reasonable expectation of privacy arising from the stashing of drugs in another person's room.

> Appellant's final contention on the issue of standing is that he had an expectation of privacy in Rogers's room because he and his associate had leased it as a place for counting money. *We do not believe,* however, *that stashing drugs in another person's room gives the person who stashes the drugs an expectation of privacy that society regards as reasonable.*

*Id.* at 282, 708 A.2d 1126 (emphasis supplied).

The appellee in this case is claiming that he had a reasonable expectation that the police, before entering, would knock on the door of someone else's house that the appellee, after packaging heroin there, had left one hour and twenty-five minutes before the police arrived. Objectively, society does not look on such an expectation as reasonable. The appellee had no standing to object to the lack of a knock.

### The Exclusionary Sanction

But even if, *arguendo,* the appellee had a reasonable expectation of privacy in 4754 Melbourne Road; and even if, *arguendo,* the absence of a ceremonial knock were a Fourth Amendment violation, it would no longer make any difference. *Hudson v. Michigan,* 547 U.S. ——, 126 S.Ct. 2159, 165 L.Ed.2d 56 (2006), settled that question unequivocally on June 15, 2006.

*Hudson v. Michigan* dealt with a violation of the "knock and announce" rule of *Wilson v. Arkansas* and, thereby, with a

violation of the Fourth Amendment. The police, with a warrant to search for drugs and firearms, went to the Michigan home of Booker T. Hudson. They announced their presence, but then waited only a short time—perhaps "three to five seconds"—before turning the knob of the unlocked door and entering the home. The ensuing search produced large quantities of drugs and a loaded gun. Hudson's Fourth Amendment challenge was to the manner of their entry.

The trial court granted the suppression motion, but the Michigan Court of Appeals reversed. It held that "suppression is inappropriate when entry is made pursuant to warrant but without proper 'knock and announce.'" The Michigan Supreme Court denied leave to appeal.

The United States Supreme Court affirmed the Michigan decision. It initially noted that in *United States v. Banks*, 540 U.S. at 40–41, 124 S.Ct. 521, it had held that a delay of between 15 and 20 seconds between the announcement of presence and the entry of the home was not, in that case, a constitutional violation. The Court observed:

> When the knock-and-announce rule does apply, *it is not easy to determine precisely what officers must do.* How many seconds' wait are too few? *Our "reasonable wait time" standard . . . is necessarily vague.*

126 S.Ct. at 2161, 165 L.Ed.2d at 63 (emphasis supplied).

The Court then breathed a sigh of relief, however, that the "knock and announce" merits were not before it. The State of Michigan had conceded that the Fourth Amendment had been violated, and the Supreme Court considered itself bound by that concession. The only issue before the Court was that of the appropriate sanction for a violation of the "knock and announce" rule.

> Happily, these issues [the merits] do not confront us here. From the trial level onward, *Michigan has conceded* that the entry was *a knock-and-announce violation. The issue here is remedy.*

*Id.* (emphasis supplied).

*Hudson v. Michigan* also reminded us, to rather general surprise, that *Wilson v. Arkansas,* when it constitutionalized

(or recognized the constitutionality of) the "knock and announce" rule in 1995, had never actually decided whether the exclusionary rule of evidence was an appropriate sanction for a "knock and announce" violation. In *Wilson v. Arkansas,* the State had asked the Supreme Court to rule, as an alternate holding, that "exclusion is not a constitutionally compelled remedy where the unreasonableness of a search stems from the failure of announcement." The Supreme Court, however, declined to address the issue.

> Because *this remedial issue was not addressed by the court below* and is not within the narrow question on which we granted certiorari, *we decline to address these arguments.*

514 U.S. at 937 n. 4, 115 S.Ct. 1914 (emphasis supplied).

The question, therefore, was one of first impression in *Hudson v. Michigan.*

> *Wilson* specifically declined to decide whether the exclusionary rule is appropriate for violation of the knock-and-announce requirement. That question is squarely before us now.

126 S.Ct. at 2161, 165 L.Ed.2d at 63–64.

*Hudson v. Michigan* may well turn out to be a landmark decision. For those who would read the wind, there are in the majority opinion ominous forebodings for the future of the exclusionary rule. The case's immediate concern, however, was only with the applicability of the exclusionary rule to a "knock and announce" violation.

### A Costly Sanction

Calling back to the front of the brain the thrust and counterthrust of the great national debate that raged in courts and legislatures and bar associations and law reviews in the decades leading up to the 1961 promulgation of *Mapp v. Ohio, Hudson v. Michigan* reminds us that the exclusion of evidence is by no means an automatic sanction to be blithely taken for granted. The exclusion of evidence is branded as a sanction that exacts a heavy cost.

*Suppression of evidence,* however, *has always been our last resort, not our first impulse. The exclusionary rule generates "substantial social costs," United States v. Leon,* 468 U.S. 897, 907, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984), which sometimes include setting the guilty free and the dangerous at large. *We have* therefore been "cautio[us] against expanding" it, *Colorado v. Connelly,* 479 U.S. 157, 166, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986), and "have *repeatedly emphasized that the rule's 'costly toll'* upon truth-seeking and law enforcement objectives *presents a high obstacle for those urging [its] application," Pennsylvania Bd. of Probation and Parole v. Scott,* 524 U.S. 357, 364–365, 118 S.Ct. 2014, 141 L.Ed.2d 344 (1998).

126 S.Ct. at 2163, 165 L.Ed.2d at 64 (emphasis supplied).

### Cost–Benefit Analysis

 Because of that heavy cost, the Supreme Court has consistently been very tentative in applying the sanction. It has, in application by application, engaged in a delicate balancing of the respective costs and benefits. It must be remembered, of course, that the only recognized benefit is exclusively that of general deterrence of unreasonable police conduct. *Linkletter v. Walker,* 381 U.S. 618, 85 S.Ct. 1731, 14 L.Ed.2d 601 (1965), established unequivocally that the purpose of the exclusionary rule of *Mapp v. Ohio* is only that of general deterrence. It is not remedial (in the sense of vindicating a right of the defendant) and it is not to serve the imperative of judicial integrity (to keep the judge's hands clean). See *Stone v. Powell,* 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976); *United States v. Leon,* 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984), for confirmation of that narrow purpose.

*Hudson v. Michigan* spoke of the balancing of "deterrence benefits" versus "social costs."

*We have rejected "[i]ndiscriminate application" of the rule, Leon, supra,* at 908, 104 S.Ct. 3405, 82 L.Ed.2d 677, *and have held it to be applicable only* "where its remedial objectives are thought most efficaciously served," *United States v. Calandra,* 414 U.S. 338, 348, 94 S.Ct. 613, 38

L.Ed.2d 561 (1974)—that is, *"where its deterrence benefits outweigh its 'substantial social costs,'"* *Scott, supra,* at 363, 524 U.S. 357, 118 S.Ct. 2014, 141 L.Ed.2d 344 (quoting *Leon, supra,* at 907, 104 S.Ct. 3405).

*Id.* (emphasis supplied).

On the basis of its determinations that the social costs outweighed the likely deterrence, the Supreme Court declined to suppress competent evidence, notwithstanding the fact that it was the product of a Fourth Amendment violation, when the evidence was offered before a grand jury, *United States v. Calandra,* 414 U.S. 338, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974); in a federal *habeas corpus* hearing, *Stone v. Powell, supra;* in a civil trial, *United States v. Janis,* 428 U.S. 433, 96 S.Ct. 3021, 49 L.Ed.2d 1046 (1976); in a deportation hearing, *Immigration and Naturalization Service v. Lopez–Mendoza,* 468 U.S. 1032, 104 S.Ct. 3479, 82 L.Ed.2d 778 (1984); at a parole revocation hearing, *Pennsylvania Board of Probation and Parole v. Scott,* 524 U.S. 357, 118 S.Ct. 2014, 141 L.Ed.2d 344 (1998); in rebuttal to impeach a witness's testimonial credibility, *United States v. Havens,* 446 U.S. 620, 100 S.Ct. 1912, 64 L.Ed.2d 559 (1980); or pursuant to the "good faith" exception to the exclusionary rule, *United States v. Leon, supra; Massachusetts v. Sheppard,* 468 U.S. 981, 104 S.Ct. 3424, 82 L.Ed.2d 737 (1984). The cost-benefit balancing has been a consistently followed test of exclusion.

The cost-benefit analysis in *Hudson v. Michigan* similarly yielded the conclusion that, on balance, Hudson was not entitled to a get-out-of-jail-free card.

*[T]he exclusionary rule has never been applied except "where ·its deterrence benefits outweigh its 'substantial social costs.'" The costs here are considerable.* In addition to *the grave adverse consequence that exclusion* of relevant incriminating evidence *always entails* (viz., *the risk of releasing dangerous criminals into society* ), imposing that massive remedy for a knock-and-announce violation would generate a constant flood of alleged failures to observe the rule, and claims that any asserted *Richards* justification for

a no-knock entry had inadequate support. *The cost of entering this lottery would be small, but the jackpot enormous: suppression of all evidence, amounting in many cases to a get-out-of-jail-free card.*

126 S.Ct. at 2165–66, 165 L.Ed.2d at 66–67 (emphasis supplied).

### A Shift in Emphasis

With implications going beyond this "knock and announce" case, Justice Scalia's majority opinion went out of its way to explain that language extolling the exclusionary rule had once been very expansive but had, in more recent decades, been drastically curtailed.

*We did not always speak so guardedly. Expansive dicta in Mapp,* for example, *suggested wide scope for the exclusionary rule. See, e.g.,* 367 U.S., at 655, 81 S.Ct. 1684, 6 L.Ed.2d 1081 ("[A]ll evidence obtained by searches and seizures in violation of the Constitution is, by that same authority, inadmissible in a state court"). *Whiteley v. Warden, Wyo. State Penitentiary,* 401 U.S. 560, 568–569, 91 S.Ct. 1031, 28 L.Ed.2d 306 (1971), was to the same effect. But *we have long since rejected that approach.* As explained in *Arizona v. Evans,* 514 U.S. 1, 13, 115 S.Ct. 1185, 131 L.Ed.2d 34 (1995): *"In Whiteley, the Court treated identification of a Fourth Amendment violation as synonymous with application of the exclusionary rule to evidence secured incident to that violation. Subsequent case law has rejected this reflexive application of the exclusionary rule."*

126 S.Ct. at 2163–64, 165 L.Ed.2d at 64 (emphasis supplied).

### Indispensability of a Causal Connection

The exclusion of evidence, moreover, is not a sanction randomly available for any police misconduct. Before evidence may be excluded, it must be shown that the evidence was, in fact, the product of the Fourth Amendment violation in issue, not simply that it was recovered after the violation. *Hudson v. Michigan* explained that the evidence recovered from the warranted search in that case would have been

recovered even if the police had delayed their entry for another 20 or 30 seconds, rather than entering the house prematurely. The evidence was produced as a result of the search warrant, not as a result of the "knock and announce" violation. The evidence would have been recovered even if the police had not jumped the gun and entered a few moments earlier than they should have entered. That it might have been recovered 15 seconds later rather than 15 seconds earlier was utterly immaterial.

> [E]xclusion may not be premised on the mere fact that a constitutional violation was a "but-for" cause of obtaining evidence. . . . In this case, the constitutional violation of an illegal *manner* of entry was *not* a but-for cause of obtaining the evidence. *Whether that preliminary misstep had occurred or not, the police would have executed the warrant* they had obtained, *and would have discovered the gun and drugs inside the house.*

126 S.Ct. at 2164, 165 L.Ed.2d at 64–65 (emphasis supplied).

In his concurring opinion, Justice Kennedy very articulately set out the necessity for a causal link between the Fourth Amendment violation and the evidence sought to be suppressed.

> Under our precedents *the causal link between a violation of the knock-and-announce requirement and a later search is too attenuated to allow suppression.* Cf. *United States v. Ramirez,* 523 U.S. 65, 72 n. 3, 118 S.Ct. 992, 140 L.Ed.2d 191 (1998) (application of the exclusionary rule depends on the existence of a "sufficient causal relationship" between the unlawful conduct and the discovery of evidence). *When,* for example, *a violation results from want of a 20–second pause but an ensuing, lawful search lasting five hours discloses evidence of criminality, the failure to wait at the door cannot properly be described as having caused the discovery of evidence.*

> . . . .

In this case *the relevant evidence was discovered not because of a failure to knock-and-announce, but because of a subsequent search pursuant to a lawful warrant.*

126 S.Ct. at 2171, 165 L.Ed.2d at 72 (emphasis supplied).

When the evidence in issue may follow the violation but is not the product of the violation, there is no conceivable justification for paying the high social cost of excluding it.

### Core Values And Peripheral Values

It is not to demean the importance of the "knock and announce" rule to point out that it serves a relatively peripheral Fourth Amendment value rather than one of its two core values. The "knock and announce" rule concerns not the fundamental question of the breach of privacy itself by governmental entry into a protected haven ("the poor man's cottage" or "the Englishman's castle") but only the method or manner of that entry. Was it unannounced? Was it too precipitous? Was it with too much force?

The classic statement of the core values protected by the Fourth Amendment and its warrant requirement was that by Justice Stewart in *Coolidge v. New Hampshire,* 403 U.S. 443, 467, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971), as he spoke of "the two distinct constitutional protections":

First, the magistrate's scrutiny is intended to eliminate altogether searches *not* based on probable cause. The premise here is that *any intrusion in the way of search or seizure is an evil, so that no intrusion at all is justified without a careful prior determination of necessity. The second, distinct objective is that those* searches deemed necessary *should be as limited as possible.* Here, *the specific evil is the "general warrant"* abhorred by the colonists, and *the problem is not that of intrusion per se, but of a general, exploratory rummaging in a person's belongings.* The warrant accomplishes this second objective by requiring a "particular description" of the things to be seized.

(Emphasis supplied). See also *State v. Brooks*, 148 Md.App. 374, 404, 812 A.2d 342 (2002).

The core dangers being guarded against concern 1) entry or intrusion into the home and 2) scope violations. Entry into the zone of privacy is the first danger to be guarded against. It requires no less than probable cause and frequently requires a warrant. The "knock and announce" rule does not prevent an entry or intrusion. It only delays it by no more than a minute. The second danger is that a search, even one properly begun, might run down hill and degenerate into a fishing expedition or a general rummaging about. The protection against that danger is the function of the Fourth Amendment's particularity clause. The "knock and announce" rule does not guard against either of those prominent dangers. *Hudson v. Michigan* then described the different interests that the rule does protect.

> One of those interests is the protection of human life and limb, because an unannounced entry may provoke violence in supposed self-defense by the surprised resident. *Another interest is the protection of property. The knock-and-announce rule gives individuals "the opportunity* to comply with the law and *to avoid the destruction of property* occasioned by a forcible entry." And thirdly, *the knock-and-announce rule protects those elements of privacy and dignity that can be destroyed by a sudden entrance.* It gives residents the "opportunity to prepare themselves for" the entry of the police. *"The brief interlude between announcement and entry* with a warrant *may be the opportunity that an individual has to pull on clothes or get out of bed."* In other words, it assures the opportunity to collect oneself before answering the door.

126 S.Ct. at 2164, 165 L.Ed.2d at 66 (emphasis supplied).

What the Supreme Court's opinion found to be significant was the interest in the evidence that was not protected by the "knock and announce" rule.

> *What the knock-and-announce rule has never protected,* however, *is one's interest in preventing the government*

*from seeing or taking evidence described in a warrant. Since the interests that were violated in this case have nothing to do with the seizure of the evidence, the exclusionary rule is inapplicable.*

*Id.* (emphasis supplied).

## The Issue of Viable Alternatives

There then follow in the opinion unmistakable subterranean rumblings of possible future import in the discussion of viable alternatives to an exclusionary rule. Through the decades of debate between *Weeks v. United States,* 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 in 1914 and *Mapp v. Ohio* in 1961, it was universally agreed that in the best of all possible worlds, the criminal would go to jail because the evidence showed him to be guilty and the policeman who violated the Fourth Amendment would also suffer some punishment for that violation. The problem was that a criminal trial did not present the best of all possible worlds.

It was acknowledged that excluding evidence of a defendant's guilt gave the defendant a benefit to which he was not personally entitled, but the courts could conceive of no other way to punish (and thereby deter from future violations) the erring officer. The caselaw regularly justified an admittedly awkward and unsatisfying sanction because of the absence of "any viable alternative." Without a viable sanction, *Mapp* announced, the Amendment would be "reduced to a nullity."

It was the inappropriateness of punishing the policeman by rewarding the criminal that inspired John Henry Wigmore's classic parody on the exclusionary rule, as it, in effect, announced.

"Titus, you have been found guilty of conducting a lottery; Flavius, you have confessedly violated the Constitution. *Titus ought to suffer imprisonment for crime, and Flavius for contempt.* But no! We shall let you *both* go free. *We shall not punish Flavius directly, but shall do so by reversing Titus' conviction.* This is our way of teaching people like Flavius to behave, and of teaching people like Titus to behave, and incidentally of securing respect for the Consti-

tution. *Our way of upholding the Constitution is not to strike at the man who breaks it, but to let off somebody else who broke something else."*

8 *Wigmore on Evidence* (3d ed.1940) § 2184 at 40 (emphasis supplied).

*Hudson v. Michigan* then prophetically observed that the fact that there may have been no viable alternative to the exclusionary rule when *Mapp v. Ohio* was decided does not mean that no viable alternatives have been developed in the intervening 45 years.

*We cannot assume that exclusion* in this context *is necessary deterrence* simply *because we found that it was necessary deterrence* in different contexts and *long ago. That would be forcing the public today to pay for the sins and inadequacies of a legal regime that existed almost half a century ago.*

126 S.Ct. at 2167, 165 L.Ed.2d at 68 (emphasis supplied). We are no longer in 1961.

Justice Scalia pointed to the birth and subsequent development of the § 1983 federal tort action for a constitutional violation as a post-*Mapp* development of a viable alternative.

*Dollree Mapp could not turn to 42 U.S.C. § 1983 for meaningful relief; Monroe v. Pape,* 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961), which began *the slow but steady expansion of that remedy,* was decided the same Term as *Mapp. It would be another 17 years before the § 1983 remedy was extended to reach the deep pocket of municipalities, Monell v. New York City Dept. of Social Servs.,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Citizens whose Fourth Amendment rights were violated by federal officers could not bring suit until 10 years after *Mapp,* with this Court's decision in *Bivens v. Six Unknown Fed. Narcotics Agents,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971).

*Id.* (emphasis supplied).

The Supreme Court elaborated on that § 1983 theme further in terms of the more recent incentives to lawyers to take and pursue such suits.

Hudson complains that "it would be very hard to find a lawyer to take a case such as this," but 42 U.S.C. § 1988(b) answers this objection. *Since some civil-rights violations would yield damages too small to justify the expense of litigation, Congress has authorized attorney's fees for civil-rights plaintiffs. This remedy was unavailable in the heydays of our exclusionary-rule jurisprudence,* because it is tied to the availability of a cause of action. For years after *Mapp,* "very few lawyers would even consider representation of person who had civil rights claims against the police," *but now "much has changed. Citizens and lawyers are much more willing to seek relief in the courts for police misconduct." The number of public-interest law firms and lawyers who specialize in civil-rights grievances has greatly expanded.*

*Id.* (emphasis supplied). There is an implication that the exclusionary rule may be caught in a time warp half a century old.

The Court then considered the viability of a § 1983 tort action as an alternative to the exclusionary rule in the specific context of "knock and announce" violations.

It is clear, at least, that *the lower courts are allowing colorable knock-and-announce suits to go forward, unimpeded by assertions of qualified immunity.* As far as we know, *civil liability is an effective deterrent here, as we have assumed it is in other contexts.* "[T]he threat of litigation and liability will adequately deter federal officers for *Bivens* purposes no matter that they may enjoy qualified immunity" (as violators of knock-and-announce do not).

126 S.Ct. at 2167, 165 L.Ed.2d at 69 (emphasis supplied).

The Court's opinion then turned to the growth of police professionalism and departmental discipline as yet another newly developed and viable alternative way of deterring police misconduct.

*Another development over the past half-century that deters civil-rights violations is the increasing professionalism of police forces, including a new emphasis on internal*

*police discipline.* Even as long ago as 1980 we felt it proper to "assume" that unlawful police behavior would "be dealt with appropriately" by the authorities, *United States v. Payner,* but we now have increasing evidence that police forces across the United States take the constitutional rights of citizens seriously. There have been "wide-ranging reforms in the education, training, and supervision of police officers." ... Moreover, modern police forces are staffed with professionals; *it is not credible to assert that internal discipline, which can limit successful careers, will not have a deterrent effect.* There is also evidence that the increasing use of various forms of citizen review can enhance police accountability.

*Id.* (emphasis supplied).

In his concurring opinion, Justice Kennedy alluded to both of these post-*Mapp* developments as newly emerged and viable alternatives to the exclusionary rule.

*Our system has developed procedures for* training police officers and *imposing discipline for failures to act competently and lawfully.* If those measures prove ineffective, they can be fortified with more detailed regulations or legislation. *Supplementing these safeguards are civil remedies, such as those available under 42 U.S.C. § 1983,* that provide restitution for discrete harms. *These remedies apply to all violations, including,* of course, *exceptional cases in which unannounced entries cause severe fright and humiliation.*

*Suppression is another matter.*

126 S.Ct. at 2170, 165 L.Ed.2d at 72. Something is blowing in the wind.

### "Knock and Announce" Violations Do Not Trigger the Exclusionary Rule

After its extensive analysis of the pro's and con's of the exclusionary rule—its purpose and its history—the Supreme Court concluded that, on balance, the exclusion of evidence is

too heavy a price to pay for a "knock and announce" violation and that there are, moreover, other viable alternatives.

*[T]he social costs of applying the exclusionary rule to knock-and-announce violations are considerable;* ... *the extant deterrents against them are substantial*—incomparably *greater than* the factors deterring warrantless entries *when Mapp was decided. Resort to the massive remedy of suppressing evidence of guilt is unjustified.*

126 S.Ct. at 2168, 165 L.Ed.2d at 69 (emphasis supplied).

Without an exclusionary rule, there is no way to win a suppression hearing.

**RULING SUPPRESSING EVIDENCE VACATED AND CASE REMANDED FOR TRIAL; COSTS TO BE PAID BY APPELLEE.**